IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CLIFTON WILLIAMS, | : | |
| | : | |
| Plaintiff, | : | CIVIL NO. 4:08-CV-0044 |
| | : | |
| v. | : | Hon. John E. Jones III |
| | : | |
| JEFFREY BEARD, *et al.*, | : | |
| | : | |
| Defendants. | : | |

## MEMORANDUM

March 30, 2011

## THE BACKGROUND OF THIS MEMORANDUM IS AS FOLLOWS:

On January 7, 2008, Plaintiff Clifton Williams ("Plaintiff" or "Williams"), an inmate presently confined at the Mahanoy State Correctional Institution ("SCI-Mahanoy") in Frackville, Pennsylvania, initiated this civil rights action *pro se* by filing a Complaint pursuant to the provisions of 42 U.S.C. § 1983. This case is proceeding on Plaintiff's Amended Complaint (Doc. 23), which was filed on April 29, 2008.

Presently before the Court is a Motion for Summary Judgment filed on behalf of Defendants. (Doc. 73.) For the reasons set forth below, the Motion will be granted.

## I.    PROCEDURAL BACKGROUND

At the outset of his Statement of Claim in his Amended Complaint, filed on

April 29, 2008, Williams articulates his claim as follows:

> The 'Free Exercise Clause' of the First Amendment, the 'Equal
> Protection Clause' of the Fourteenth Amendment, and the 'Religious
> Land Use and Institutional Persons Act of 2000' ["RLUIPA"] all protect
> the right of Muslim prisoners to conduct their approved and regularly
> scheduled congregational worship services in a designated area free of
> any images, symbols, or artifacts represented or associated with idolatry
> or idol worship.

(Doc. 23 at 5 § IV. ¶ 1.)  Williams alleges that a violation of the above right, as

articulated by him, occurs "each year during the Christmas holiday season" from

approximately December 1 through January 7 when the SCI-Mahanoy Chaplaincy

Department "erects a twelve (12) to fifteen (15) foot decorated Christmas Tree in the

Chapel and hang Christmas wreaths on nails around the Chapel walls."  (*See id.* at 5-

6.)  Plaintiff further alleges as follows:

> The idolatrous history of the Evergreen Tree and Evergreen Wreaths,
> being erected during the holiday season, as a symbol of God, as wall
> decor for pagan idol worship, and as artifacts of superstition make them
> unacceptable and offensive to be present in the Chapel at the time the
> Muslims are scheduled to conduct their weekly congregational service
> and offer their congregational prayers in that facility.
>
> However, when this matter was brought to the attention of the
> Chaplaincy Program Director, thereafter, the Muslim set-up crew, of
> which plaintiff is a member, was ordered not to touch the Christmas tree

>or remove the Christmas wreaths from the walls while cleaning the
>Chapel and setting-up for our congregational services under the threat of
>disciplinary action.  The following year, the threat was upgraded that if
>we touched the Christmas tree or the Christmas wreaths we would
>immediately be placed in RHU (Restricted Housing Unit, aka 'The
>Hole') and then issued a misconduct report.  This upgraded threat was
>accompanied with a show-of-force by security personnel and the
>presence of administrative personnel including the then Superintendent.
>This threat to the Muslim set-up crew is still standing.

(*See id.* at 6-7.)  Plaintiff alleges that this violation of his constitutional rights occurred

during his first Christmas season at SCI-Mahanoy in 2005-2006, during his second

Christmas season at SCI-Mahanoy in 2006-2007, and during the 2007-2008 Christmas

season at SCI-Mahanoy that occurred just prior to the initiation of this action.  (*See id.*

at 8-10.)

As relief, Plaintiff seeks a declaratory judgment explaining the legal rights of

Muslims and the obligations of prison officials regarding those rights.  (*See id.* at 13

1.)  He also seeks three forms of injunctive relief.  First, he seeks an injunction to

enjoin Pennsylvania Department of Corrections ("DOC") officials from harassing him

because he is a Muslim.  (*See id.* at 14-18.)  Second, he seeks an injunction to end the

practice at SCI-Mahanoy of placing Christmas wreaths and trees in the location where

Muslims worship.  (*See id.* at 18.)  Finally, he seeks an injunction directing that he be

allowed access to his departmental file so that he can challenge any slanderous

information in the file and have it expunged.  (*See id.* at 18-19.)  In addition, Plaintiff

seeks compensatory and punitive damages.  (*See id.* at 13.)

On June 16, 2008, Defendants filed an Answer to the Amended complaint.

(Doc. 29.)  After requesting an extension of time, which was granted, on June 17,

2009, Defendants filed a Motion for Summary Judgment.  (Doc. 73).  Williams

subsequently filed a Motion for Continuance under the provisions of Federal Rule of

Civil Procedure 56(f) to allow him to obtain additional discovery in order to oppose

Defendants' Motion for Summary Judgment.  (Doc. 83.)  By Memorandum and Order

dated February 26, 2010, we granted Plaintiff's Motion for Continuance in order to

allow him to obtain limited discovery before April 30, 2010 (*see* Doc. 86 at 9-12), and

denied Defendants' Motion for Summary Judgment without prejudice to their ability

to renew the Motion after April 30.  (*See* Doc. 86.)  By Order dated May 17, 2010, we

directed that all dispositive motions, together with supporting papers, should be filed

or renewed on or before June 18, 2010.  (Doc. 87.)

On June 3, 2010, Defendants filed a Motion for Renewal of their previously

submitted Motion for Summary Judgment.  (Doc. 88.)  In their Motion, Defendants

represented that they had not been served with any additional discovery requests by

Plaintiff.  (*See id.* ¶ 12.)  By Order dated June 4, 2010, we granted Defendants'

4

Motion, and the Motion for Summary Judgment (Doc. 73) that presently is before the Court was reinstated.  (Doc. 89.)  Our Order also reinstated the Statement of Materials Facts (Doc. 74) and supporting brief (Doc. 75) that previously had been filed on behalf of Defendants, and directed Plaintiff to file his opposition to the Motion, as required by Middle District of Pennsylvania Local Rules ("LR") 7.6 and 56.1, on or before June 25, 2010.  (*Id.*)

On June 29, 2010, Plaintiff filed a Motion requesting a ten (10) day extension of time to file his opposition brief.  (Doc. 90.)  Along with his Motion, he filed a document entitled "Motion in Opposition to Defendants' Motion for Summary Judgment" (Doc. 91) and a Statement of Material Facts (Doc. 92) responding to Defendants' Statement.  He also submitted supporting exhibits.  (Doc. 92-2.)  In requesting an extension, Plaintiff explained that he did not have sufficient time in the prison law library to complete his opposition brief by the deadline.  (*See* Doc. 90.)  By Order dated June 30, 2010, we granted Plaintiff's Motion, and directed him to file his opposition brief on or before July 6, 2010.  (Doc. 93.)  Although Plaintiff's opposition brief was filed on July 7, 2010, the attached certificate of service reflects that he placed the document in the mail on July 2, 2010, and thus it was timely filed.  (*See* Doc. 94.)  Accordingly, the instant Motion is fully briefed and ripe for disposition.

## II.    STANDARD OF REVIEW

Summary judgment is appropriate if the record establishes "that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).[1]  Initially, the moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The movant meets this burden by pointing to an absence of evidence supporting an essential element as to which the non-moving party will bear the burden of proof at trial. *Id.* at 325.  Once the moving party meets its burden, the burden then shifts to the non-moving party to show that there is a genuine issue for trial. Fed. R. Civ. P. 56(e)(2).  An issue is "genuine" only if there is a sufficient evidentiary basis for a reasonable jury to find for the non-moving party, and a factual dispute is "material" only if it might affect the outcome of the action under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986).

In opposing summary judgment, the non-moving party "may not rely merely on allegations or denials in its own pleadings; rather, its response must . . . set out

---

[1] We note that an amendment to the text of Fed. R. Civ. P. 56 became effective on December 1, 2010.  The amendment did not result in a change to the standard (i.e. the word "issue" within subsection (c) has been changed to "dispute").  Even so, we quote the language of the version of the Rule that was in effect at the time Defendants moved for summary judgment as it is appropriate to dispose of the instant Motion under that version. *See Fairclough v. Wawa, Inc.,* 2010 WL 5209327, at *3 n.3 (3d Cir. Dec. 23, 2010).

specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2).  The non-moving party "cannot rely on unsupported allegations, but must go beyond pleadings and provide some evidence that would show that there exists a genuine issue for trial." *Jones v. United Parcel Serv.*, 214 F.3d 402, 407 (3d Cir. 2000).  Arguments made in briefs "are not evidence and cannot by themselves create a factual dispute sufficient to defeat a summary judgment motion." *Jersey Cent. Power & Light Co. v. Twp. of Lacey*, 772 F.2d 1103, 1109-10 (3d Cir. 1985).  However, the facts and all reasonable inferences drawn therefrom must be viewed in the light most favorable to the non-moving party.  *P.N. v. Clementon Bd. of Educ.*, 442 F.3d 848, 852 (3d Cir. 2006).

Summary judgment should not be granted when there is a disagreement about the facts or the proper inferences that a factfinder could draw from them.  *Peterson v. Lehigh Valley Dist. Council*, 676 F.2d 81, 84 (3d Cir. 1982).  Still, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson*, 477 U.S. at 247-48.

## III.   STATEMENT OF FACTS

With the above standard of review in mind, we set forth the following facts material to the present motion, drawing any reasonable inferences in favor of the non-

7

moving party, Williams.

At all times relevant to the allegations contained in the Amended Complaint, Plaintiff Williams was incarcerated at SCI-Mahanoy. (Doc. 74, Dfts. Statement of Material Facts ("SMF"), ¶ 1; Doc. 92, Pltf. SMF, ¶ 1.) Defendants are the following present or former employees of SCI-Mahanoy: former Superintendent Edward Klem; former Classification and Program Manager James Unell; former Facility Chaplaincy Program Director Reverend Joseph Whalen[2]; current Superintendent John Kerestes; Chaplain Nelson Zeiset; and, Pennsylvania Department of Corrections ("DOC") employees, Secretary Jeffrey Beard and the Administrator for Religion and Inmate Services, Reverend Ulrich Klemm. (Doc. 74 ¶ 2; Doc. 92 ¶ 2.)

Williams is serving a life sentence for homicide and has been incarcerated in the custody of the DOC since 1990. (Doc. 74 ¶ 3; Doc. 92 ¶ 3.) He has served portions of his sentence at SCI-Graterford, SCI-Rockview, SCI-Dallas, and SCI-Mahanoy. (*Id.*) Williams became a Muslim in 1976, and he has practiced his Islamic faith throughout his incarceration in DOC facilities. (Doc. 74-7, Pltf. Dep. Tr., at 10-13, Pages 28-40.)[3]

---

[2]Defendants Klem, Unell, and Whalen are retired from the DOC.

[3]Citations to page numbers of documents filed in this action are to the numbers generated by
(continued...)

8

In November 2005, Williams was transferred to SCI-Mahanoy.  (*Id.* at 13, Page 40.)  Although Williams asserts in opposing the instant Motion that his religious practice has been "burdened" throughout his confinement at SCI-Mahanoy (*see* Doc. 92 ¶ 4), during his deposition, he testified that, while at SCI-Mahanoy, he has considered himself a member of the Islamic faith and has continued to practice that faith, including by participating in weekly Jumu'ah services held on Fridays in the multi-faith chapel at that facility.  (Doc. 74-4, Pltf. Dep. Tr., at 13, Pages 40-41.)  Williams also testified that the services are conducted by Imam Hnesh, the Muslim chaplain, or if he is not present, by certain resident prisoners who are permitted to conduct the services.  (*Id.*, Pages 41-42; Doc. 74, Dfts. SMF, ¶ 4.)  Williams further testified that he goes to the multi-faith chapel at SCI-Mahanoy to participate in other services, including Eid congregational prayers, which occur at the completion of Ramadan and at the completion of the Hajj season.  (Doc. 74-7 at 14, Page 42.)

When the members of the Muslim congregation offers prayer during the services, they face the northeasterly direction, which is toward the front of the chapel, and remain focused in that direction for the entire service.  (Doc. 74, Dft. SMF, ¶ 6; Doc. 92, Pltf. SMF, ¶ 6; Doc. 74-7, Pltf. Dep. Tr., at 17, Page 57; Doc. 74-7 at 86,

---

[3](...continued)
the CM/ECF Electronic Filing System.

Pltf. Dep. Ex. 2, Chapel Floorplan.)  The Jumu'ah services last anywhere from forty-five (45) minutes to an hour or hour and a half.  (Doc. 74-7 at 18, Page 59.)

Williams also prays in his cell and prays five (5) times per day at a minimum, specifically prior to sunrise; after the sun declines from its zenith, or the noon prayer, which is anywhere from the declining of the sun to mid-afternoon; the afternoon, which is midway between the sun's zenith and its setting; and after the sun sets.  (Doc. 74, Dfts. SMF, ¶ 7; Doc. 92, Pltf. SMF, ¶ 7.)

A.    **DOC and SCI-Mahanoy Policies and Procedures Regarding Diversity of Worship**

Defendants Klemm, Whalen, Zeiset, Kerestes, and Klem have declared under penalty of perjury that the DOC and SCI-Mahanoy are committed to providing inmates with the opportunity to practice the basic tenets of their faith through religious programs and services.  (Doc. 74-2, Klemm Decl., ¶ 4; Doc. 74-3, Whalen Decl., ¶ 4; Doc. 74-4, Zeiset Decl., ¶ 4; Doc. 74-5, Kerestes Decl., ¶ 8; Doc. 74-6, Klem Decl., ¶ 8.)  DOC Inmates, including those inmates at SCI-Mahanoy, are permitted to follow the tenets of their religious faith group.  (*Id.*)  The DOC and SCI-Mahanoy policies and procedures allow for diversity of worship and reasonable accommodation for inmates in a manner consistent with the order, safety, and security of the correctional facility, prison staff, and inmates.  (*Id.*)

10

Plaintiff disputes that the DOC and SCI-Mahanoy policies and procedures allow for diversity of worship and reasonable accommodation for inmates based on his assertion that when he explained to institutional officials that congregational worship in a place free of all idols, images and symbols of idolatry is "central to the religion of Islam", and that the Christmas decorations in the multi-faith chapel are "in essence" symbols of pagan idolatry and superstition, they made no good faith effort to reasonably accommodate this "central tenet" of the Muslim religion, and instead used a physical show of force and threat of official retaliation to intimate him to forego his pursuit of this central tenet.  (Doc. 92 ¶ 8.)  Plaintiff cites generally to his deposition testimony and his Amended Complaint as support for his opposing statement of fact.

Williams also cites generally to his deposition testimony and his Amended Complaint to dispute the declarations by Defendants Klemm, Whalen, Zeiset, Kerestes, and Klem given under penalty of perjury that, in correctional institutions, such as SCI-Mahanoy, where religious services are conducted in multi-faith chapels or a common shared space, faith specific sacred symbols are removed or covered after each particular faith group has conducted its worship in order to respect the religious beliefs of all inmates utilizing the multi-faith chapel.  (*See* Docs. 74-2 through 74-6.) Specifically, Williams contends that "no effort" was made to remove or cover faith

specific symbols consisting of a Christmas tree and wreahts before Muslims worshiped in the chapel, and instead SCI-Mahanoy staff utilized force and intimidation to impose these "faith specific symbols" upon Muslim inmates.  (Doc. 92 ¶ 9.)

Williams also disputes in the same manner the declarations of Klemm, Whalen, Zeiset, Kerestes, and Klem that, in order to allow for diversity of worship and accommodation, reasonable accommodation and some degree of tolerance and respect by each faith group is warranted.  (*See* Doc. 74 ¶ 10; Doc. 92 ¶ 10)  At SCI-Mahanoy, each specific faith group is responsible for ensuring that their specific sacred symbols are removed or covered after each particular faith group has conducted its worship. (*See id.*)  Williams disputes the foregoing statement with regard to Christmas decor erected in the multi-faith chapel.  (Doc. 92 ¶ 10.)

With respect to these areas of dispute that have just been set forth regarding DOC and SCI-Mahanoy policies and procedures with respect to diversity of worship, a party responding to a motion for summary judgment may not rest on the allegations of his complaint, but rather must point to some evidence that shows there is a genuine issue for trial.  *See Jones, supra*, 214 F.3d at 407.  Where Williams has cited to his Amended Complaint, and his deposition testimony reiterating allegations of his

Amended Complaint, in support of these areas of dispute, he has failed to controvert

Defendants statements of fact as to the DOC and SCI-Mahanoy policies and

procedures with respect to diversity of worship.

### B.    Christmas Decorations in the Multi-Faith Chapel at SCI-Mahanoy

In December 2005, 2006, and 2007, a Christmas tree that was approximately

twelve (12) to fifteen (15) feet tall, and approximately five (5) to six (6) wreaths, were

placed in the multi-faith chapel at SCI Mahanoy.  (Doc. 74-3, Whalen Decl., ¶ 8; Doc.

74-4, Zeiset Decl., ¶ 8; Doc. 74-5, Kerestes Decl., ¶ 13; Doc 74-6, Klem Decl., ¶ 11;

Doc. 74-7, Pltf. Dep. Tr., at 17, Pages 55, 57, at 30, Page 107.)  Out of respect for the

beliefs of non-Christians, the tree was on wheels, and prior to non-Christian services,

the tree was wheeled to the rear of the chapel, and on occasion, a blackboard was

placed in front of it, although it did not completely cover it.  (Doc. 74-3 ¶ 8; Doc. 74-4

¶ 8; Doc. 74-5 ¶ 13; Doc. 74-6 ¶ 11; Doc. 74-7 at 17, Page 54; at 30, Page 107.)

The tree was visible upon entering the chapel. (Doc. 74-7 at 16-17, Pages 53-54.)

However, Muslim inmates worshiping in the chapel face the front of the chapel during

prayer (*see* Doc. 74, Dft. SMF, ¶ 6; Doc. 92, Pltf. SMF, ¶ 6; Doc. 74-7, Pltf. Dep. Tr.,

at 17, Page 57; Doc. 74-7 at 86, Pltf. Dep. Ex. 2, Chapel Floorplan), and therefore, the

tree was out of the line of sight of the Muslim inmates while they were praying.  (Doc.

74-3 ¶ 8; Doc. 74-4 ¶ 8; Doc. 74-5 ¶ 13; Doc. 74-6 ¶ 11.)

During the 2005-2006 holiday season, the Muslim set-up crew also would take down all of the wreaths and place them on pews where they were not visible during Muslim worship services.  (Doc. 74-7 at 17, Page 56.)  Subsequently, the set-up crew was not permitted to remove the smaller wreaths because they were being destroyed during the set-up process.  (Doc. 74-3 ¶ 8; Doc. 74-4 ¶ 9; Doc. 74-5 ¶ 13.)   However, before Muslim worship services, someone from the Christian community still would remove the large wreaths that were in the front of the chapel.  (Doc. 74-7, Pltf. Dep. Tr., at 30, Page 106.)  The Christmas tree and wreaths were present in the multi-faith chapel for approximately four (4) to five (5) weeks.  (*Id.*)

## C.   Williams' Grievances

Pursuant to DC-ADM 804, the Inmate Grievance System Policy, any inmate personally affected by a Department or institutional action or policy or by the action of a Department employee is permitted to file a grievance after attempting to resolve the issue informally.  (Doc. 74 ¶ 14; Doc. 92 ¶ 14.)

If the inmate is not satisfied with the Initial Review Response, he may appeal the decision to the Facility Manager/Superintendent.  (Doc. 74 ¶ 15; Doc. 92 ¶ 15.) The Superintendent then provides a written response to the grievant.  (*Id.*)  Any

14

inmate who is not satisfied with the decision of the Facility Manager may submit an appeal to the Secretary's Office of Inmate Grievances and Appeals ("Secretary's Office"). (*Id.*)

The Secretary's Office reviews the original grievance and the Initial Review Response, the appeal to the Superintendent and the response, along with the appeal to final review. (Doc. 74 ¶ 16; Doc. 92 ¶ 16.) The Secretary's Office then provides a written response to the final appeal to the inmate, and a copy of the response to the Superintendent of the institution. (*Id.*)

On the first Friday in December 2005, which was the first holiday season that Williams was housed at SCI-Mahanoy, he noticed the Christmas tree and approximately five (5) to six (6) evergreen wreaths hanging around the walls of the chapel. (Doc. 74-7, Pltf. Dep. Tr., at 15, Page 49.) Williams found these items to be "somewhat offensive." (*Id.*)

At the time of the Jumu'ah service on that day, Williams brought the matter of the Christmas tree and wreaths to the attention of the Muslim chaplain, Abdel-Hamid Hnesh. (Doc. 74-7, Pltf. Dep. Tr., at 18-19, Pages 61-62.) According to Williams, the Imam, who was from out of the country, was not familiar with the history of Christmas decorations. (*Id.* at 19, Page 62.) Therefore, Williams explained the

15

history to the Imam, and in particular, the association of the decorations with idolatry and pagan worship.  (*Id.*)  After apprising the Imam of this information, Williams took the matter to the head of the religious department, who at that time, was Father Whalen.  (*Id.*, Page 63.)

### 1.    Williams' Grievance to Defendant Whalen

On December 28, 2005, Father Whalen, the Facility Chaplain Program Director, received an Inmate Request to Staff Member, dated December 27, 2005, from Williams.  (Doc. 74-3, Whalen Decl., ¶ 9; Doc. 74-3 at 10, 12/27/05 Inmate's Request to Staff Member.)  In the request, Williams stated that the decorated evergreen tree and the wreaths hanging around the multi-faith chapel walls were "Islamically unacceptable."  (*Id.*)  Williams also noted that he would send a copy of the request to the Islamic Chaplain, Imam Hnesh.  (*Id.*)

On December 28, 2005, Whalen responded to Williams, suggesting to him that he learn his religion and learn to respect diversity, especially in a place that mandates one multi-faith chapel for worship.  (Doc. 74-3, Whalen Decl., ¶ 10; Doc. 74-3 at 10, 12/27/05 Inmate's Request, Response Section.)  Whalen further informed Williams that the Christmas tree is on wheels and is moved to the rear of the chapel.  (*Id.*)  He also informed Williams that the wreaths are not a religious symbol and suggested to

him that if it was a problem for him, he should pray in his cell.  (*Id.*)

## 2.     Events of December 30, 2005

On December 30, 2005, Father Whalen was absent from the institution, and

Chaplain Nelson Zeiset, the Protestant Chaplain at SCI-Mahanoy, was the duty

chaplain.  (Doc. 74-4, Zeiset Decl., ¶ 9; Doc. 74-7, Pltf. Dep. Tr., at 20, Pages 67-70.)

Williams, as a member of the Muslim set-up crew that prepared the chapel for

Jumu'ah services, questioned Zeiset about the placement of the wreaths in the multi-

faith chapel.  (*Id.*)  Zeiset told Williams that, based upon his understanding from

Father Whalen, the Christmas tree is to be wheeled to the rear of the chapel, out of the

sight of the Muslim prayer line, and wreaths were not to be removed from the chapel

walls because they were being destroyed during Jumu'ah set-up.  (*Id.*)  Chaplain

Zeiset explained to the Muslim set-up crew that Father Whalen had told him that the

wreaths were not to be removed.  (*Id.*)  Some members of the crew became angry, and

that anger boiled out into their intonations in the way that they were speaking.  (Doc.

74-7 at 21, Page 70.)

Williams was not satisfied with Zeiset's response, and requested that he contact

his superior, Classification and Program Manger, James Unell.  (*Id.*; Doc. 74-4 ¶ 10.)

Mr. Unell came to the chapel, and after a brief discussion, he permitted the Muslim

17

set-up crew to remove all of the wreaths from the chapel walls.  (Doc. 74-7 at 21,

Pages 70-71; Doc. 74-4 ¶ 10.)

At the following Friday's Jumu'ah service, supervisory personnel and

correctional officers, as well as the Muslim Imam, were present at the chapel.  (Doc.

74-7 at 21, Pages 72-73.)  The Muslim set-up crew was informed that if the wreaths

were touched, they would be placed in pre-hearing confinement and issued a

misconduct report.  (*Id.* at 21, Page 73.)  The wreaths were not removed for the

service, and no misconducts were issued.  (*Id.* at 21-22, Pages 73-74.)

### 3.    Williams' 1/7/06 Grievance to Defendant Unell

On January 7, 2006, Williams submitted an official Inmate Grievance, No.

140572.  (Doc. 74-7 at 23, Page 78; Doc. 74-3, Whalen Decl., ¶ 11; Doc. 74-5,

Kerestes Decl., ¶ 16; Doc. 74-6, Klem Decl., ¶ 14.)  In his grievance, Williams

requested that the decorated Christmas tree and wreaths hanging in the chapel be

removed.  (*Id.*)  He stated that these artifacts are offensive to Islamic worship and

unacceptable in an area where Muslims perform their worship.  (*Id.*)

The grievance was assigned to the Classification and Program Manager, James

Unell.  (Doc. 74-7 at 23, Page 79; Doc. 74-3 ¶ 12; Doc. 74-5 ¶ 17; Doc. 74-6 ¶ 15.)

According to his response to the grievance, Unell and Whalen met with Williams and

18

informed him that the staff at SCI-Mahanoy had always encouraged the spiritual development of the men incarcerated, while respecting and providing reasonable accommodations for the fourteen (14) different religious factions that currently use the Religious Chapel, and to allow for such diversity of worship and accommodation, some degree of tolerance is to be expected for all involved parties.  (*Id.*)

Unell's response further informed Williams that he would discuss the matter with Father Whalen, Imam Hnesh, and other administrative staff, and that, prior to the next Christmas season, a determination would be made as to whether any decorative procedures should be changed.  (Doc. 74-5, Kerestes Decl., ¶ 18; Doc. 74-6, Klem Decl., ¶ 16 Doc. 74-7 at 24, Page 83.)  Williams contends in opposing the instant Motion that he made inquiries to Imam Hnesh about this meeting throughout the year, and the Imam told him that no meeting had taken place.  (Doc. 92 ¶¶ 26-28.)  He contends that "the bad faith" of Mr. Unell and Superintendent Klem emerged the following Christmas season when Klem, supported by a show of force, had Williams and the Muslim set-up crew informed that if they touched the Christmas decorations, they would immediately be placed in the "Hole."  (*Id.*)

### 4.      Williams' 2/6/06 Appeal to Defendant Klem

On February 6, 2006, Williams appealed Unell's response to Grievance No.

140572 to Superintendent Klem.  (Doc. 74-5 ¶ 19; Doc. 74-6 ¶ 17; Doc. 74-7 at 24,

Page 82.)  After a review of Williams' appeal, as well as Unell's response, on March

1, 2006, Klem informed Williams that he upheld the initial response to the grievance.

(Doc. 74-5 ¶ 19; Doc. 74-6 ¶ 17, Doc. 74-7 at 24-25, Pages 85-86.)  Williams then

appealed Klem's decision to the DOC Office of Inmate Grievances and Appeals.

(Doc. 74-5 ¶ 19; Doc. 74-6 ¶ 17; Doc. 74-7 at 25, Pages 86-87.)  Prior to the 2006-

2007 Christmas season, the DOC Office of Grievances and Appeals denied Williams'

appeal of Grievance No. 140752 regarding the presence of a Christmas tree and

wreaths in the SCI-Mahanoy multi-faith chapel.  (Doc. 74-3 ¶ 15; Doc. 74-5 ¶ 20;

Doc. 74-6 ¶ 18; Doc. 74-7 at 26, Pages 90-91.)

## D.    Christmas 2006-2007

In accordance with the resolution of the grievance, the placement of the

Christmas tree and wreaths in the multi-faith chapel at SCI-Mahanoy was continued

into the December 2006-07 season.  (*Id.*; Doc. 74-7 at 26-27, Pages 93-96.)  As in

previous seasons, while the Christmas tree was placed in the multi-faith chapel, in

respect for the beliefs of non-Christians, the tree was on wheels, and prior to non-

Christian services, the tree was wheeled to the rear of the chapel.  (Doc. 74-6 ¶ 19;

Doc. 74-7 at 27, Page 94.)  Although the tree was visible as you enter the chapel,

20

Muslim inmates worshiping in the chapel face the front of the chapel during prayer

(*see* Doc. 74, Dft. SMF, ¶ 6; Doc. 92, Pltf. SMF, ¶ 6; Doc. 74-7 at 17, Page 57; Doc.

74-7 at 86, Pltf. Dep. Ex. 2, Chapel Floorplan), and therefore, the tree is out of their

line of sight during worship.  (*Id.*)

      **E.**      **Williams' 9/2007 Request to Kerestes**

In September 2007, Superintendent Kerestes received a written request from

Williams regarding his prayers during his work assignments in the institution's

kitchen and the placement of the Christmas tree and wreaths in the multi-faith chapel.

(Doc. 74-5, Kerestes Decl., ¶ 11; Doc. 74-7 at 28, Pages 100-101.)  After receiving

Williams' request, Kerestes contacted Father Whalen, the Facility Chaplain Program

Director.  (Doc. 74-5 ¶ 12.)  Father Whalen informed Kerestes that the matter of the

Christmas tree and wreaths had been previously addressed by the Secretary's Office of

Inmate Grievances and Appeals and that, in accordance with the resolution of the

grievance, the placement of the Christmas tree and wreaths in the multi-faith chapel at

SCI-Mahanoy would be continued into the December 2007-2008 season.  (*Id.*)

Whalen also informed Kerestes that, while the Christmas tree was placed in the

multi-faith chapel, in respect for the beliefs of non-Christians, the tree was on wheels,

and prior to non-Christian services, the tree was wheeled to the rear of the chapel and

was out of the line of sight of the Muslim inmates when they worshiped in the chapel.

(*Id.* ¶ 13.)  Whalen also explained that the large wreath was removed from the front of

the chapel, but the smaller wreaths no longer were permitted to be removed from the

side of the walls because they were being destroyed during the set-up process.  (*Id.*)

On October 3, 2007, Kerestes informed Williams that both of his issues had

been grieved and reviewed and that, at that time, there were no plans to change the

policies or procedures.  (*Id.* ¶ 21; Doc. 74-7 at 29, Pages 103-04.)  In October 2007,

Williams appealed Kerestes' decision in a letter to Secretary Beard.  (Doc. 74-5 ¶ 22;

Doc. 74-2, Klemm Decl., ¶ 12; Doc. 74-7 at 28, Pages 103-04.)  In December 2007,

the Administrator for Religion and Volunteer Services, Reverend Ulrich Klemm,

responded to Williams' appeal to Secretary Beard.  (Doc. 74-2 ¶ 16.)  Klemm

informed Williams that SCI-Mahanoy was very conscious of the need to provide a

neutral space of worship for all faith groups.  (*Id.*)  He also informed him that the

Christmas tree was moved out of the line of sight of Muslims during their worship,

and that the DOC Central Office was very satisfied with the efforts of SCI-Mahanoy

staff to accommodate inmates of varying faith beliefs.  (*Id.*)

### F.     Christmas 2007-2008

In accordance with Reverend Klemm's response, the placement of the

Christmas tree and wreaths in the multi-faith chapel at SCI-Mahanoy was continued into the December 2007 season.  (Doc. 74-5, Kerestes Decl., ¶ 23.)  As in previous seasons, while the Christmas tree was placed in the multi-faith chapel, in respect for the beliefs of non-Christians, the tree was on wheels, and prior to non-Christian services, the tree was wheeled to the rear of the chapel.  (*Id.*)  The tree was out of the sight of Muslim inmates when they worshiped in the chapel, and the large wreath was removed from the front of the chapel.  (*Id.*)

At no time did the SCI-Mahanoy Facility Chaplaincy Program Director ("FCPD"), the Superintendents, or Reverend Klemm, the Religious and Volunteer Director for the DOC, receive any concerns or complaints from the Jehovah Witness, Jewish, or Native American congregations concerning the presence of a Christmas tree, religious symbols, or accommodations in the multi-faith chapel at SCI-Mahanoy from December 2005 through December 2008.  (*Id.* ¶ 24; Doc. 74-2 ¶ 15; Doc. 74-3 ¶ 19; Doc. 74-4 ¶ 15;  Doc. 74-6 ¶¶ 20-21.)

In December 2008, in furtherance of an effort to provide a neutral space of worship for all faith groups, the placement of the Christmas tree in the SCI-Mahanoy multi-faith chapel was discontinued.  (Doc. 74-2, Klemm Decl., ¶ 18; Doc. 74-5, Kerestes Decl., ¶ 28.)

## IV.    DISCUSSION

### A.    Statute of Limitations

Defendants assert that Williams' claim for injunctive relief stemming from alleged retaliation that occurred in 1992, 1995, and 2005 is barred by the applicable statute of limitations.  Specifically, Williams alleges that, during his incarceration at SCI-Rockview, sometime between 1992 and 1995, after he addressed a concern on behalf of the Muslim community concerning statuettes around the walls of the interfaith chapel at that institution, "Father Crouse and Mr. McCullough began to call various members of the Muslim community to their offices to view slanderous information in what appeared to be Plaintiff's institutional file in an effort to defame Plaintiff and undermine his credibility among the Muslims."  (Doc. 23, Amended Complaint, at 14-15.)  Williams alleges that, after he was transferred to SCI-Dallas in 1995, he was "subjected to the ongoing wrong that began at Rockview" in that the administration there reviewed the false information that had been placed in his institutional file.  (*Id.* at 16.)  He claims that, while at SCI-Dallas, he was subjected to "a barrage of misconduct reports" and that inmates were placed in his cell who stole from him and tampered with his food.  (*Id.*)  He further claims that "there were constant false accusations of homosexuality, child molestation, rape and sexually

24

mutilating a corpse" and also that he was a "chronic masturbator." (*Id.*) Williams alleges that these same issues continued following his transfer to SCI-Mahanoy in 2005. (*Id.* at 17.) Williams seeks an injunction upon Secretary Beard to stop DOC personnel from retaliating against him. (*Id.* at 17-18.)

It is well-settled that claims brought pursuant to 42 U.S.C. § 1983 are subject to the state statute of limitations for personal injury actions. *Wilson v. Garcia,* 471 U.S. 261, 266-67 (1985). In Pennsylvania, the statute of limitations for a personal injury action is two years. 42 Pa. Cons. Stat. Ann. § 5524. A cause of action accrues for statute of limitations purposes when the plaintiff knows or has reason to know of the injury that constitutes the basis of the cause of action. *Sameric Corp. of Delaware, Inc. v. City of Philadelphia,* 142 F.3d 582, 599 (3d Cir. 1998); *see also Nelson v. County of Allegheny,* 60 F.3d 1010 (3d Cir. 1995). Williams commenced this action on January 7, 2008, and thus his claim for injunctive relief arising out of events that occurred two (2) years prior, or before January 7, 2006, is barred by the applicable statute of limitations.

In opposing the instant Motion, Williams argues that Defendants seek to "misuse" the statute of limitations to unfairly obstruct him from receiving warranted relief from the unlawful actions of prison officials. (*See* Doc. 94, Pltf. Opposition Br.,

at 3-5.)  He asserts that it is difficult for him as a prisoner to gather the evidence

necessary to support his claims, and further that, pursuant to the doctrine of

"continuing wrong", his claim for relief from ongoing wrongs is not precluded by the

statute of limitations.  (*See id.*)

The continuing violations doctrine is an "equitable exception to the timely

filing requirement."  *West v. Philadelphia Elec. Co.,* 45 F.3d 744, 754 (3d Cir. 1995).

However, it is well-settled that the continuing violations doctrine "will not stop the

ticking of the limitations clock [once] plaintiff obtained requisite information [to state

a claim].  On discovering an injury and its cause, a claimant must choose to sue or

forego that remedy."  *Barnes v. American Tobacco Co.,* 161 F.3d 127, 154 (3d Cir.

1998) (quoting *Kichline v. Consolidated Rail Corp.,* 800 F.2d 356, 360 (3d Cir.

1986)); *see also Lake v. Arnold*, 232 F.3d 360, 366-68 (3d Cir. 2000).  Here, Williams

does not allege that he was unaware of the alleged wrongs at the time they were

occurring in 1992, 1995, and 2005, and thus he was on notice of his injury stemming

from the occurrences in each of those years long before he filed this action in 2008.

Consequently, there is no basis to toll the statute of limitations based upon application

of the continuing violations doctrine, and we reiterate our conclusion above that

Williams' claim for injunctive relief stemming from alleged wrongs that occurred

prior to January 2006 is barred by the applicable statute of limitations.

### B.    RLUIPA Claim

RLUIPA provides, in relevant part, that "[n]o government shall impose a

substantial burden on the religious exercise of a person residing in or confined to an

institution . . . even if the burden results from a rule of general applicability, unless the

government demonstrates that imposition of the burden on that person (1) is in

furtherance of a compelling governmental interest; and (2) is the least restrictive

means of furthering that compelling governmental interest."  42 U.S.C. § 2000cc-l(a).

Initially, to prevail on a claim under RLUIPA, an inmate must establish that he

possesses a sincerely held, authentic religious belief, the exercise of which the

government has substantially burdened.  *See Cutter v. Wilkinson*, 544 U.S. 709, 725

n.13 (2005).  Therefore, while "RLUIPA bars inquiry into whether a particular belief

or practice is 'central' to a prisoner's religion, *see* 42 U.S.C. § 2000cc-5(7)(A), the

Act does not preclude inquiry into the sincerity of a prisoner's professed religiosity."

*Id.*

To state a claim under RLUIPA, an inmate plaintiff bears the *prima facie*

burden of showing that a prison policy or practice has substantially burdened the

practice of that inmate's religion.  42 U.S.C. § 2000cc-2(b); *Washington v. Klem,* 497

F.3d 272, 277-78 (3d Cir. 2007).  The Third Circuit has adopted the following definition of "substantial burden" in this context:

> For the purposes of RLUIPA, a substantial burden exists where: 1) a follower is forced to choose between following the precepts of his religion and forfeiting benefits otherwise generally available to other inmates versus abandoning one of the precepts of his religion in order to receive a benefit; OR 2) the government puts substantial pressure on an adherent to substantially modify his behavior and to violate his beliefs.

*Washington,* 497 F.3d at 280.

If an inmate proves that the government substantially burdened the exercise of a sincerely held religious belief, the burden then shifts to the government, and the Court must determine whether the government has demonstrated that the burden was imposed both in furtherance of a compelling government interest and represents the least restrictive means of furthering that compelling government interest.  *See Washington*, 497 F.3d at 282.  In making this determination, the Court is mindful of the fact that "'context matters'", *Cutter*, 544 U.S. at 723 (quoting *Grutter v. Bollinger*, 539 U.S. 306, 327 (2003)), and gives "'due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources.'" *Id.* (quoting S.Rep.No. 103-111, at 10, U.S. Code Cong. & Admin. News 1993, pp. 1892, 1899, 1900.)

In the case at hand, the undisputed factual record establishes that the staff at SCI-Mahanoy took measures to accommodate the various faith groups who utilize the multi-faith chapel at that facility, including by requiring each specific faith group to remove or cover their specific sacred symbols following their worship services, and during the Christmas season, by placing the Christmas tree on wheels, and wheeling it to the rear of the chapel prior to non-Christian services  and removing the large wreath from the front of the chapel.  It also is undisputed that smaller wreaths on the side walls of the chapel initially were removed, but subsequently were not permitted to be removed because they were being destroyed during the set-up process.  However, it also is undisputed that the Muslim congregation faces the front of the chapel when they pray and stay focused in that same direction for the entirety of their services.

Although Williams suggests that the Imam did not understand the issue[4], it is undisputed that the Imam at SCI-Mahanoy continued to hold services in the multi-faith chapel throughout the Christmas season of 2005, 2006, and 2007, and that he at no time voiced any complaints or concerns to the SCI-Mahanoy FCPD, the

---

[4]Williams attempts to explain the Imam's failure to complain by stating that the Imam is not from the United States and is therefore unfamiliar with Christmas decorations and the constitutional rights of Muslim prisoners in this country.  (Doc. 92 ¶ 36.)  Notwithstanding that the Imam, as a trained Muslim leader, would know upon seeing an object that it is offensive to his religion, even if he does not know exactly what the object is, Williams fails to dispute the fact that the Imam made no complaints about the accommodations provided in the multi-faith chapel for Muslim worship services.

Superintendents or Reverend Klemm regarding the presence of a Christmas tree, religious symbols, or accommodations generally in the multi-faith chapel. (Doc. 74 ¶ 36.) It is significant that Williams does not dispute that the Imam was present at the time the Muslim set-up crew was told not to remove the small wreaths from the walls in January 2006, and that the wreaths were not removed, no misconducts were issued, and the Imam conducted the service. (Doc. 74, Dfts. SMF, ¶ 23; Doc. 92, Pltf. SMF, ¶ 23.) Further, Williams' own deposition testimony establishes that he continuously has attended weekly Jumu'ah services and Eid prayers at the multi-faith chapel, including during the Christmas season, and offers prayer five times per day at a minimum. (*See* Doc. 74-7 at 13-14, Pages 41, 42, 45-46.) It is evident from this record that Williams was not forced to choose between or abandon the precepts of his religion in order to receive or forfeit any benefit, nor was any substantial pressure placed upon him to substantially modify his behavior and to violate his beliefs, and thus he has failed to meet his burden to establish a RLUIPA claim, and Defendants are entitled to judgment as a matter of law as to this claim.

## C.    Free Exercise Claim

Prisoners must be afforded "reasonable opportunities" to exercise the religious freedom guaranteed by the First and Fourteenth Amendments to the United States

Constitution.  *Cruz v. Beto*, 405 U.S. 319, 322 n.2 (1972).  Even so, "lawful

incarceration brings about the necessary withdrawal or limitation of many privileges

and rights, a retraction justified by the considerations underlying our penal system."

*O'Lone v. Estate of Shabazz,* 482 U.S. 342, 348 (1987) (quotations omitted).  In

*Shabazz,* the Supreme Court determined that prison regulations that allegedly infringe

upon an inmate's "religious" rights as protected by the First Amendment must be

reviewed under a "reasonableness" test that is less restrictive than that ordinarily

applied to alleged infringements of fundamental constitutional rights.  *Id.*  In so

concluding, the Court held that when a prison regulation impinges on inmates'

constitutional rights "the regulation is valid if it is reasonably related to legitimate

penological interests."  *Id.* at 349.

The *Shabazz* Court applied the four (4) factor test set forth in *Turner v. Safley*,

482 U.S. 78, 89 (1987) in determining whether the regulation was "reasonably

related."  The four (4) factors set forth by the *Turner* Court are as follows: (1) whether

there is a "valid, rational connection between the prison regulation and the legitimate

governmental interest put forward to justify it"; (2) whether there are "alternative

means of exercising the right that remain open to prison inmates"; (3) "the impact

accommodation of the asserted constitutional right will have on guards and other

31

inmates, and on the allocation of prison resources generally"; and (4) the availability of "ready alternatives" for furthering the governmental interest.  *Turner*, 482 U.S. at 89-90.

A plaintiff bears the burden of persuasion.  *See Beard*, 548 U.S. at 529 (citing *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003) ("The burden, moreover, is not on the State to prove the validity of prison regulations but on the prisoner to disprove it.") Moreover, we accord great deference to prison administrators in the adoption and execution of policies and practices that are necessary to preserve internal order and to maintain institutional security.  *Bell v. Wolfish*, 441 U.S. 520, 527 (1979).

Williams has alleged that Defendants violated his right to free exercise of religion by not providing an area "free of any images, symbols or artifacts representing or associated with idolatry or idol worship" for Muslim prisoners to conduct their "approved and regularly scheduled worship services."  (Doc. 23, Amended Complaint, at 5 § IV.)  He specifically challenges the practice at SCI-Mahanoy during the Christmas seasons of 2005-2006, 2006-2007, and 2007-2008, of putting up a Christmas tree and wreaths in the multi-faith chapel, even though, prior to Muslim services, the tree was wheeled to the back of the room, and covered (albeit, not completely) with a blackboard; the large wreaths were removed from the front of

the chapel; and the small wreaths initially were taken down, then subsequently were left hanging on the side walls but were out of the line of vision of the Muslim worshipers.

In considering the first *Turner* factor, we find that there clearly is a rational connection between this practice and the legitimate government interests put forth to justify it, namely the need to accommodate various faith groups who utilize the multi-faith chapel to allow for diversity of faith and worship with the recognition that some degree of accommodation and tolerance is required by each faith group that uses the space. The practice just described accommodates the groups for whom Christmas is a religious observance by allowing them to have decorations associated with Christmas present when they worship, while also recognizing that, for the groups who do not observe Christmas, the decorations need to be moved or covered as much as is reasonably possible.

In evaluating the second *Turner* factor, "courts must examine whether an inmate has alternative means of practicing his or her religion generally, not whether an inmate has alternative means of engaging in the particular practice in question." *Dehart v. Horn,* 227 F.3d 47, 55 (3d Cir. 2000). Where "other avenues remain available for the exercise of the inmate's religious faith, courts should be particularly

conscious of the measure of judicial deference owed to corrections officials . . . ." *Id.* at 55, 57. *See also Sutton v. Rasheed*, 323 F.3d 236, 255 (3d Cir. 2003). In this case, it is evident that Williams had alternative means of practicing his religion generally by choosing to pray in his cell rather than attending group services during Christmas season, and the factual record is undisputed that Williams not only exercised this alternative, but also chose to continue to fully participate in group worship in the multi-faith chapel during all of the Christmas seasons at issue. Because it is apparent that Williams continuously was able to practice his faith, an examination of the second *Turner* factor does not indicate that the practice at issue at SCI-Mahanoy was unreasonable.

In considering the third *Turner* factor, to accommodate Williams, it would be necessary either to eliminate the placement of Christmas decorations in the multi-faith chapel entirely or to require that staff and inmate set-up crews be responsible to completely move the decorations out of the room before Muslim services. The elimination of Christmas decorations would have a negative impact on those faith groups that consider them to be part of their religious observation of Christmas. Requiring that the items be moved out of the room entirely before Muslim services would place an unreasonable burden on SCI-Mahanoy staff and inmates from other

34

faith groups, who also seemingly would be responsible for moving the items back into the room for their own worship services.  In addition, a burden would be placed on prison resources generally in dedicating additional time, as well as additional space, to these efforts.  This burden is particularly unreasonable where the record establishes that a reasonable solution has been reached of moving the items to the back of the room or ensuring that the items remaining are on the sides of the room out of the focus of the worshipers who are facing the front of the room.

Finally, in considering the fourth *Turner* factor, although the alternatives of not having Christmas decorations at all in the multi-faith chapel, or moving them out entirely before Muslim services, are options that would accommodate Williams, these options are not "ready alternatives" in that the negative impact of these options on other inmates and staff makes them unreasonable.  In particular, neither option would be consistent with the legitimate penological objective of accommodating all faith groups who utilize the chapel by exercising reasonable accommodation and some degree of tolerance and respect for each faith group to allow for diversity of worship and accommodation in the use of the multi-faith chapel.  As such, the application of the *Turner* factors in this case leads to a conclusion that Williams' free exercise rights were not violated by the practice at SCI-Mahanoy with respect to Christmas

decorations in 2005-2006, 2006-2007, and 2007-2008, and thus Defendants are entitled to judgment as a matter of law as to this claim.

### D.     Equal Protection Claim

"The Equal Protection Clause commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws.'" *Vacco v. Quill*, 521 U.S. 793, 799 (1997); U.S. Const. amend. XIV, § 1.  This is not a command that all persons be treated alike, but, rather, a direction that all persons similarly situated be treated alike.  *See City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 439 (1985).  "The central purpose of the Equal Protection Clause of the Fourteenth Amendment is the prevention of official conduct discriminating on the basis of race," *Whren v. United States*, 517 U.S. 806, 813 (1996), or any other suspect classification. *See Regents of the Univ. of California v. Bakke*, 438 U.S. 265, 291 (1978) ("the guarantee of equal protection cannot mean one thing when applied to one individual and something else when applied to a person of another color" and "racial and ethnic distinctions of any sort are inherently suspect and thus call for the most exacting judicial examination").

To succeed on an equal protection claim, Williams must show an intentional or purposeful discrimination.  *Wilson v. Schillinger*, 761 F.2d 821, 929 (3d Cir. 1985),

*cert. denied*, 475 U.S. 1096 (1986).  This "state of mind" requirement applies equally to claims involving (1) discrimination on the basis of race, religion, gender, alienage or national original (2) the violation of fundamental rights and (3) classifications aased on social or economic factors.  *See, e.g., Britton v. City of Erie*, 933 F. Supp. 1261, 1266 (W.D. Pa. 1995), *aff'd* 100 F.3d 946 (3d Cir. 1996); *Adams v. McAllister*, 798 F. Supp. 242, 245 (M.D. Pa. 1992), *aff'd*, 972 F.2d 1330 (3d Cir. 1992).  In addition, Williams must show that he was similarly situated to, and treated differently than, other inmates at SCI-Mahanoy with respect to their ability to conduct worship services at that institution.

Although Williams attempts to establish that the manner in which staff at SCI-Mahanoy handled Christmas decorations at the multi-faith chapel was motivated by discrimination against Muslims by submitting a 2001 newspaper article concerning the firing of two DOC employees from SCI-Mahanoy who blew the whistle on alleged racism that occurred in that institution (*see* Doc. 92-2 at 17, Pltf. Ex. C), this article fails to establish that Williams was the subject of intentional discrimination in the context of this action.  In short, Williams has failed to submit any evidence to show that he, as a member of the Muslim community, was treated differently than other inmates similarly situated who are members of faith groups that do not observe

Christmas within their religions with regard to the handling of Christmas decorations in the multi-faith chapel.  As a result, Williams' equal protection fails, and Defendants are entitled to judgment as a matter of law as to this claim.

## V.      CONCLUSION

For the foregoing reasons, the Motion for Summary Judgment filed on behalf of Defendants will be granted.  An appropriate Order will enter on today's date.